**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION**

FILED

| | | |
|---|---|---|
| JAY MACHLEIT, individually; | ) | SEP 1 4 2020 |
| TRIPLE C DEVELOPMENT, | ) | Clerk, U. S. District Court |
| INC.; MACH -1 Express Wash, LLC; | ) | Eastern District of Tennessee |
| | ) | At Chattanooga |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 1:20-cv-270 |
| | ) | Mc Donough/ Steger |
| KAREN HUTTON;HUTTON | ) | |
| CHERRY HILL NJ ST, | ) | |
| LLC; and HUTTON ST 17, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COME NOW, the plaintiff Jay Machleit individually ("Machleit"), Mach-1 Express Wash, LLC ("Mach-1') and Triple C Development, Inc., ("Triple C") (collectively herein the "Plaintiffs") and files this cause of action against Karen Hutton, individually ("Hutton")Hutton Cherry Hill NJ ST, LLC, ("Hutton CH") and Hutton ST 17, LLC ("Hutton ST") (collectively herein the "Defendants")alleging as follows:

### The Parties

1.    Jay Machleit ("Machleit") is an adult resident of the state of Alabama.

2.     Triple C Development, Inc. ("Triple C"), is a corporation organized and existing under the laws of the state of Alabama.  Triple C has an interest in the Cherry Hill project referenced in this action.

3.     Mach-1 Express Wash, LLC ("Mach-1") is a limited liability company organized in accordance with, and existing under the laws of the state of Delaware. The sole member of Mach-1 is Jay Machleit.

4.     Karen Hutton is an adult resident of the state of Tennessee, and does business in Hamilton County, Tennessee.  Hutton may be served at: 736 Cherry Street, Chattanooga, Tennessee 37402.

5.     Hutton Cherry Hill NJ ST, LLC, is a limited liability company organized and existing under the laws of the state of New Jersey with its principal place of business in Hamilton County, Tennessee.  Hutton CH may be served through its registered agent for service of process: Corporation Service Company, 100 Charles Ewing Blvd, Suite 160, Princeton S Corporate CTR, Ewing, NJ 08628.

6.     Hutton ST 17, LLC, is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in Hamilton County, Tennessee.  Hutton ST may be served through its registered agent for service of process: Corporation Service Company, 100 Charles Ewing Blvd, Suite 160, Princeton S Corporate CTR, Ewing, NJ 08628.

2

7.    Upon information and belief, Hutton CH is, or claims to be, the successor in interest to Hutton ST, and both entities are controlled by Hutton.  Upon further information and belief, Hutton ST and/or Hutton CH participated in the matters referenced herein and/or are alter egos of Hutton.

## Jurisdiction and Venue

8.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because there exists complete diversity of parties.  Further, the amount in controversy exceeds $75,000.00, exclusive of costs and fees.

9.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because some or all of the Defendants reside in this district.  Venue is also proper in this Court because  some of the acts or omissions occurred in Hamilton County, and pursuant to the Global Settlement Agreement referenced herein, the parties agreed that courts of competent jurisdiction in Hamilton County, Tennessee, shall be the appropriate forum for resolving any disputes involving the global settlement agreement.

## Factual Allegations

10.    Machleit is a carwash developer and operator headquartered in Centre, Alabama.

3

11.    Hutton is a real estate developer headquartered in Chattanooga, Tennessee. Upon information and belief, Hutton's business focuses on *inter alia* shopping centers, not carwashes.

12.    In or around 2018, Hutton attempted to perform development work for a nationally established carwash brand. Upon information and belief, the relationship ended abruptly and on bad terms so Hutton began searching for a new business partner that would help her develop carwashes.

13.    Hutton approached Machleit in December of 2018, and asked him to start a carwash venture with her. She would be the preferred developer and he would be the operator. Although, Machleit had no particular interest in starting a new carwash venture with a partner, Hutton was persistent and eventually convinced Machleit to alter his position.

14.    Hutton represented to the Plaintiffs that the business would be a joint venture, and it had potential to expand nationwide. Hutton reassured Machleit that their joint venture would be a new stand-alone business, separate from their existing businesses. Furthermore, Hutton represented that she had capital available for the venture, and no personal guarantees would be required.

15.    Eventually, due to Hutton's persistence and promises, Machleit entered into a business relationship with Hutton. Machleit trusted Hutton, believing she would work with him in good faith to develop a nationwide carwash business.

4

16.     The basic structure of the joint venture relationship between Hutton and the Plaintiffs involved the parties setting up various limited liability entities to acquire, build, operate and/or lease individual carwash locations. The parties agreed that generally, Machleit would initially find or approve carwash locations while training Hutton employees to eventually assume the role of locating sites for presentation to Machleit for his approval.

17.     Hutton would purchase the property and build the carwashes to Machleit's specifications (using a Hutton-related company to do the construction work), and then lease the facilities back to Machleit. Machleit would control and operate the facilities, and all of the entities would be linked together under a parent company owned jointly by Machleit and Hutton.

18.     Because Machleit had the most knowledge and experience developing and operating carwashes, gained through years of experience and holding of industry and trade secrets, and since he was contributing the bulk of the work, the parties agreed that Machleit would own 70% of the parent company and Hutton would own 30%.

19.     In reliance on Hutton's repeated promises and representations, Machleit substantially performed by setting numerous LLC's that would operate carwashes in various locations throughout the country.

20.     Machleit considered Hutton a friend, and he never suspected that Hutton secretly intended to drain Machleit of his valuable business information and

5

knowledge, and then abandon him after he laid the groundwork for Hutton's staff to build a carwash business independent of him and his team.

21.     Hutton represented that lawyers she selected would prepare the paperwork for the parent company contemplated by the joint venture.

22.     During this time, Hutton and her team repeatedly met with Machleit and his team gaining valuable proprietary knowledge and information regarding the carwash business, including construction plans, supplier information and other proprietary information and data.

23.     Hutton eagerly wanted to develop carwashes in 6 different markets spanning North and South Carolina. Hutton had previously explored those markets as a developer for another entity unrelated to this case, and because of that her businesses had sunk costs. She therefore actively and aggressively pushed Machleit to review site locations in those markets.

24.     Pursuant to Hutton's stated goal of developing North and South Carolina, Machleit and his team made numerous site visits beginning in early January of 2019 and researched Hutton's proposed sites. Machleit determined that all but two of the sites were unusable; thus, he and his team then identified 4 sites (1 in each of those markets) that Hutton moved forward with under the guise that the sites would be included in their joint venture.

6

25. Ultimately, Machleit executed 4 leases with Hutton in June 2019. Those leases were executed for locations in Forrest City, NC, Lexington, NC, Vineland, NJ, and Thomasville, NC.

26. Pursuant to Hutton's direction, attorneys prepared draft documents for the parent company.

27. However, the documents did not capture the full agreement of the parties, therefore, Machleit did not sign the documents Hutton presented. Hutton assured Machleit this was a nothing to worry about, and the details would be ironed out if Machleit would continue to identify more carwashes for development and operations.

28. Prior to making these false promises and assurances, Hutton had learned that Machleit already had prospective carwash locations in New Jersey, and, in addition, he held purchase rights for several carwash sites. Hutton, through false promises and coercion, convinced Machleit to assign his purchase rights to her in furtherance of their joint venture.

29. Hutton assured Machleit that if for any reason things did not work out, she would assign the purchase contracts back to Machleit pending he reimburse her third party costs. Based on and but for these representations, Machleit altered his position and assigned the following carwash locations to Hutton in furtherance of the joint venture. The Purchase Sale Agreements for the Millville, NJ site was assigned to

7

Hutton on July 8, 2019. The Purchase Sale Agreement for the Gloucester, NJ site was assigned to Hutton on July 9, 2019.

30.  Subsequently, Machleit agreed to enter into a sale/lease back agreement with Hutton for two sites Machleit previously developed and owned in Attalla, Alabama and Cedartown, Georgia. Like the other sites, both of these sites were to be included in the joint venture. Hutton purchased the Cedartown, Georgia site in June 2019. In November 2019, Hutton purchased the Attalla, Alabama site. Leases for both sites were executed shortly thereafter.

31.  Subsequently, Hutton presented Machleit with a Letter Agreement pertaining to leases for certain locations. This Letter Agreement included verbiage which referenced the Joint Venture.

32.  Around this same time, the parties added two more locations to the joint venture. Specifically, Hutton convinced Machleit to enter into a sale/lease agreement dated September 20, 2019 regarding Machleit's carwash site at Cherry Hill, NJ. Like the other agreements, the Cherry Hill agreement contemplated a sale/lease-back agreement and a joint venture between the parties. And the parties, via executed lease on October 21, 2019 added a location in Mechanicsburg, Pennsylvania, to the venture.

33.  Towards the end of October 2019, representatives from Hutton met with Machleit and his team to discuss potential partnership options.

8

34.   At this meeting, Hutton's representatives in a "take it or leave it manner" presented three options, none of which reflected the initial verbal agreement between Machleit and Hutton.

35.   Because Machleit had already invested significant time, manpower and other resources into the venture, Machleit felt he must choose one of the three options.

36.   Hutton's representatives made clear at the meeting that although Machleit, Triple C and Mach-1 had substantially performed in accordance with the stated purpose and intent of the venture, Hutton would not honor terms of the venture, particularly Hutton's assignment back to Machleit of the carwash sites.

37.   Hutton pressured Machleit to choose one of her three draconian options regarding continued operation of the joint venture.

38.   Hutton represented and misrepresented to Machleit that the intent of the Letter Agreement was essentially to act as a place-holder while the agreement for the joint venture was being finalized.

39.   In reliance upon Hutton's continued verbal and written representations and her promises regarding the joint venture agreement, Machleit signed the Post-Closing Agreement and Letter Agreements.

40.   It was agreed, and did Machleit continue working to develop more carwashes in furtherance of the joint venture, including the following locations on the corresponding dates:

9

| Lease Date | Location |
|---|---|
| Dec. 2019 | Roanoke Rapids, NC |
| Dec. 2019 | Gaffney, SC |
| Jan. 2020 | Davenport, FL |

41. In or around late December 2019, Hutton circulated a new draft of the agreement for the joint venture. The agreement still did not capture the understanding of the parties, and Machleit did not sign the document.

42. Hutton continued to represent that things would be sorted out and the documents for the parent company would be completed soon. Based on Hutton's assurances, it was agreed and did Machleit continue working on the following sites and executed leases on the corresponding dates:

| Lease Date | Location |
|---|---|
| Jan. 2020 | Kissimmee, FL |
| Jan. 2020 | Plant City, FL |
| Jan. 2020 | Goldsboro, NC |
| Jan. 2020 | Sicklerville, NJ |
| Jan. 2020 | Turnersville, NJ |

10

43.   Suddenly, and without warning, and in contradistinction to Tennessee law, Hutton abruptly attempted to deny the very existence of their joint venture and attempted to keep most, if not all, of the carwashes for herself.

44.   Even though the Plaintiffs and Defendants had at that point began developing over 15 carwash locations together, Hutton claimed that the parties never had a joint venture.

45.    By way of example, Hutton declared, "Although we have negotiated in good faith to enter into a joint venture between a Hutton affiliate and a Triple C affiliate, we have unfortunately been unable to reach such an agreement."

46.   Bewildered by Hutton's behavior, Machleit attempted to communicate with Hutton and resolve the issues.  But it did not help.

47.   While Machleit was attempting to work toward a resolution, Hutton, through her various entities, filed 14 lawsuits trying to ignore the existence of the joint venture and seize all the carwashes for herself and her companies.

48.   Upon information and belief, in an effort to further delegitimize Machleit, Hutton induced or otherwise convinced Berry Construction Company, Inc. to initiate legal proceedings against Machleit in order to engage Machleit in essentially a "two-front war".

11

49.     Over the next several weeks, Machleit's team continued to try to work out a resolution with Hutton so the parties could attempt an amicable cessation to their business relationship.

50.     In May 2020 the parties executed the Global Settlement Agreement providing for a global resolution of all claims and disputes between the parties.

51.     Hutton and Machleit agreed to settle any claims they may have against one another, and Machleit, in an effort of compromise generously allowed Hutton to keep 15 carwashes.  Pursuant to the Global Settlement Agreement Machleit had the option to purchase 3 carwash locations back from Hutton.

52.     For her part, Hutton released her claims, dismissed the lawsuits and promised to purchase the Cherry Hill carwash from Machleit for the set price of $3,573,494.81.

53.     Machleit kept his promises and terminated 15 carwash location leases giving those rights to Hutton. He then paid in excess of $5.8 million to Hutton for the carwashes in Forest City and Cedartown. Machleit elected to not purchase the Attalla, Alabama location; however, he turned over the location to Hutton in accordance with the terms set forth in the Global Settlement Agreement. Machleit trusted Hutton to perform her obligations under the Global Settlement Agreement in good faith.  But this was not to be.

12

54.     Among other things, Hutton was obligated to close on Cherry Hill by July 31,
2020. But as the closing date approached, Hutton started injecting new issues into
the deal and making additional, unnecessary demands upon Machleit.

55.     Hutton demanded that Triple C sign a Post-Closing Agreement and give
Hutton a $35,000.00 credit on the sale to satisfy her additional, and unnecessary
demands.

56.     Machleit signed the Post-Closing Agreement, performed various tasks
demanded by Hutton and gave Hutton a $35,000.00 credit.

57.     Hutton signed a Closing Settlement Statement verifying her agreement, and
the bank wired the funds for the closing.

58.     Machleit was ready, willing and able to close, but then Hutton refused to go
forward with the closing.

59.     On August 3, 2020, Hutton sent Machleit a letter attempting to terminate her
obligations. Even though the parties executed a Global Settlement Agreement
requiring Hutton to purchase Cherry Hill, Hutton refused to close.

60.     Hutton premised her reasoning for breaching the contract on an erroneous and
easily disprovable assertion that the Plaintiffs failed to honor the terms of the original
purchase agreement.

61.     Although the original Cherry Hill purchase agreement was subsumed in the
Global Settlement Agreement, the Global Settlement Agreement set forth new

obligations required of Machleit. Machleit and the Plaintiffs faithfully performed each of these requirements prior to closing.

62.     Hutton has abandoned her obligations under the Global Settlement Agreement.

63.     But for Hutton's deceptions, frauds, misrepresentations, suppressions of material facts, corporate espionage, thefts of trade secrets and general scoundrelly actions, Machleit would not have entered into the agreement(s), surrendered 15 carwash locations, paid millions of dollars for two carwashes, performed additional work at Cherry Hill.

64.     Machleit further would not have contemplated giving Hutton a credit on Cherry Hill or performed additional work on the property, if he had known Hutton did not intend to perform her purchase obligations in good faith.

65.     Machleit lost time and money due to Hutton's schemes and misconduct. Hutton's conduct is clearly in bad faith and violates the spirit and terms of her agreements. Machleit has suffered irreparable harm and damage due to Hutton's misconduct and misrepresentations.

66.     The Cherry Hill location, because of Hutton's breaches, remains shuttered, costing the Plaintiffs lost revenue and accruing expenses and costs on a daily basis.

67.     Hence, this lawsuit.

## Count I
### (Breach of Contract)

68.     Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as if fully set forth herein and further alleges:

69.     As explained in the foregoing paragraphs, Hutton entered into a Global Settlement Agreement and failed to perform her obligations.

70.     Hutton breached the Global Settlement Agreement  by, among other things, failing or refusing to purchase Cherry Hill as required under the terms of the Global Settlement Agreement.

71.     As a result of Hutton's breach of the Global Settlement Agreement, the Plaintiff suffered and continues to suffer actual harm and damages in the form of lost profit, lost earnings, and additional out-of-pocket expenses and costs.

72.     The facts as set forth above constitute a breach of contract by Hutton for which the Plaintiffs is entitled to specific performance and an award of consequential damages in an amount to be determined at trial[1].

WHEREFORE, Plaintiffs plead and pray as follows: (1) that the Plaintiffs be awarded specific performance; (2) that Plaintiffs be awarded consequential and compensatory damages as appropriate; (4) that, Plaintiffs be awarded their reasonable attorney fees; (5) that the costs of this action be taxed to the Defendants;

---

[1] Because real property and franchises are both unique, damages are usually inadequate and such contracts are generally eligible for specific performance. *See, e.g., McGaugh v. Galbreath*, 996 S.W.2d 186, 191 (Tenn. Ct. App. 1998).

15

and (6) that Plaintiffs receive such other and further relief as allowed by law or required by equity.

## Count II
### (Breach of Express and Implied Warranties)

73.     Plaintiffs adopt and incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein and further alleges:

74.     Hutton warranted, among other things, that Defendants would close on Cherry Hill and implicitly warranted that she would perform her obligations in good faith and not hinder Machleit's performance of the contract terms.

75.     Defendants improperly and/or in bad faith sought to prevent or delay performance of the agreement in order cause harm to Machleit and/or prevent the closing.

76.     Defendants breached their express and implied warranties, including the implied covenant of good faith and fair dealing by, among other things, failing to participate in the closing in good faith, requiring additional credits and work from Machleit and/or failing to purchase Cherry Hill.

77.     As a direct, proximate and foreseeable result of Defendants' breaches of their express and/or implied warranties, Plaintiffs have suffered, and will continue to suffer, injury and damages.

WHEREFORE, Plaintiffs demand an award against Defendants in an amount sufficient to compensate them for their injuries and damages, according to proof,

along with interest, a reasonable attorney fee, the costs of this action and such other and further relief, at law or equity, to which Plaintiffs may be entitled.

## Count III
### (Fraud)

78.   Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as if fully set forth herein.

79.   The facts stated herein demonstrate that Hutton made one or more false representations of material fact, including, but not limited to, representations that she would purchase Cherry Hill.  The representations were made knowingly, recklessly and/or without regard to truth.

80.   Plaintiffs relied upon the misrepresentations and suffered resulting damages.

WHEREFORE, Plaintiffs demand an award against Defendants in an amount sufficient to compensate them for their injuries and damages, according to proof, along with interest, punitive damages, a reasonable attorney's fee, the costs of the action and such other and further relief, at law or equity, to which Plaintiffs may be entitled.

## Count IV
### (Promissory Fraud)

81.   Plaintiffs adopt and incorporate by reference the allegations of the preceding paragraphs as if fully set forth herein.

82.    The facts stated herein demonstrate that Hutton made one or more false representations of material fact, including representations that she would purchase Cherry Hill.

83.    Hutton intended to deceive Machleit and had no present intent to perform at the time the representations were made.

84.    The representations were made knowingly, without belief in their truth, or recklessly without regarding to their truth or falsity.

85.    Plaintiffs relied upon the representations and suffered damages.

WHEREFORE, Plaintiffs demand an award against Defendants in an amount sufficient to compensate injuries and damages, according to proof, along with interest, punitive damages, a reasonable attorney's fee, the costs of the action and such other and further relief, at law or equity, to which Plaintiffs may be entitled.

## Count V
### (Equitable Relief)

86.    Plaintiffs adopt and incorporate by reference the factual allegations of the preceding paragraphs as if fully set forth herein.

87.    Hutton used her relationship with Machleit to obtain, among other things, money, carwashes, and valuable data and information from Machleit.  Plaintiffs performed their obligations in good faith, and Hutton has been unjustly enriched by her misconduct.  Hutton is obligated to complete her closing and disgorge any profit she or any of her entities made from her misconduct.

18

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs pray for equitable relief in the form of specific performance, namely an order requiring Hutton to complete the purchase of the Cherry Hill location, and for other good and equitable relief the Court deems proper. The Plaintiffs further pray for such reimbursement of costs and attorneys' fees expended by the Plaintiffs in bringing this action.

## Count VI
### (Declaratory Judgment)

88. Plaintiffs adopt and incorporate by reference the factual allegations of the preceding paragraphs as if fully set forth herein.

89. All parties necessary for complete adjudication of the controversy are before the Court.

90. There is a substantial controversy between the parties having adverse legal interests of sufficient immediacy and realty to warrant issuance of a declaratory judgment. A declaratory judgment is appropriate and necessary to declare the rights, status and other legal relations of the parties with respect to the matters as alleged herein.

91. Plaintiffs hereby seek an award declaring the rights and legal obligations of Machleit and Hutton as follows:

      a.    Hutton breached the Global Settlement Agreement with Machleit;

      b.    Hutton breached her duties of good faith and fair dealing;

19

c.  Hutton is obligated to close on Cherry Hill; and

d.  Hutton's claim for payment for equipment is barred or Hutton should be estopped from asserting the claim.

## COUNT VII
### (Breach of Fiduciary Duty)

92.  The Plaintiffs adopt in incorporate the preceding allegations set forth in the paragraphs above, and further allege:

93.  Hutton and the Defendants breached their fiduciary duty owed to the Plaintiffs.

94.  The parties, notwithstanding the joint venture did catty out a general partnership in connection with the development of the carwashes.

95.  As the Plaintiffs' general partners in the joint venture, the Defendants had a duty of loyalty to the Plaintiffs. The Defendants breached the duty of loyalty owed to the Plaintiffs by misrepresenting material facts regarding the Defendants' true intentions.

96.  The Defendants further breached the duty of loyalty owed to the Plaintiffs by stealing proprietary trade secrets from the Plaintiffs for the Defendants' own use and financial gain.

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs prays for judgment against the Defendants for Count VII. Further the Plaintiff prays for the award of compensatory and punitive damages in an amount to both

20

compensate the Plaintiff and the punish the Defendants as well as deter the
type of conduct exhibited by the Defendants. The Plaintiffs further prays for
the award of costs and fees associated with bringing this action.

## JURY DEMAND

97.    Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

*s/ H. Gregory Harp*
H. Gregory Harp (asb-0904-t75h)*
GREGORY HARP LLC
Post Office Box 26
Trussville, Alabama 35173
205.291.0081 (telephone)
gh@gregoryharplaw.com

*Pro hac vice* motion is pending; admitted to practice and in good standing with the
State of Alabama, United States Court of Appeals for the Eleventh Circuit; United
States District Court for the Northern District of Alabama; United States District
Court for the Middle District of Alabama

21